CT Corporation

**Service of Process Transmittal**
11/02/2015
CT Log Number 528095217

TO: Kate Cook
Electric Insurance Company
75 Sam Fonzo Dr
Beverly, MA 01915-1000

RE: **Process Served in Louisiana**

FOR: General Electric Company  (Domestic State: NY)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | WILLIAM C. BELL, Pltf. vs. FOSTER WHEELER ENERGY CORPORATION, etc., et al., Dfts. // To: General Electric Company |
| **DOCUMENT(S) SERVED:** | Citation, Petition, Opposition, Notice |
| **COURT/AGENCY:** | Civil District Court for the Parish of Orleans State of Louisiana, LA Case # 201510353 |
| **NATURE OF ACTION:** | Asbestos Litigation - Personal Injury |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Baton Rouge, LA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/02/2015 at 08:36 |
| **JURISDICTION SERVED :** | Louisiana |
| **APPEARANCE OR ANSWER DUE:** | Within 15 days after service (Document may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | JONATHAN B. CLEMENT Roussel & Clement 1550 West Causeway Approach Mandeville, LA 70471 (985) 778-2733 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/03/2015, Expected Purge Date: 11/08/2015 |
| | Image SOP |
| | Email Notification, John Hainkel  jhainkel@frilot.com |
| | Email Notification, Michelle Dale  mdale@frilot.com |
| | Email Notification, Kate Cook  kate.cook@ElectricInsurance.com |
| | Email Notification, Robin Castle  rcastle@frilot.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 3867 Plaza Tower Dr. Baton Rouge, LA 70816-4378 |
| **TELEPHONE:** | 612-333-4315 |

Page 1 of  1 / WT

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 **EXHIBIT A**

ATTORNEY'S NAME: Roussel, Gerolyn 01134
AND ADDRESS: 1714 Cannes Drive
Laplace LA 70068-2407

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
### STATE OF LOUISIANA

NO: 2015 – 10353 5 DIVISION: E SECTION: 16

BELL, WILLIAM C. VERSUS FOSTER WHEELER ENERGY CORPORTION ET AL

## CITATION

TO: GENERAL ELECTRIC COMPANY
THROUGH: ITS AGENT FOR SERVICE OF PROCESS
CT CORPORATION SYSTEM
3867 PLAZA TOWER DR
BATON ROUGE LA 70816

**YOU HAVE BEEN SUED:**

You must either comply with the demand contained in the petition
PET FOR DAMAGES W/OPPOSITION & NOTICE ATTACHED

a certified copy of which accompanies this citation, or file an answer or other legal pleading in the office of the Clerk of this Court, Room 402, Civil Courts Building, 421 Loyola Avenue, New Orleans, LA, within fifteen (15) days after the service hereof under penalty of default

### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may call the New Orleans Lawyer Referral Service at 504-561- 8828. This Referral Service operates in conjunction with the New Orleans Bar Association. If you qualify, you may be entitled to free legal assistance through the New Orleans Legal Assistance Corp. You may call them at 800-624-4771 or 504-525-4431.
*********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE*********

IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the Parish of Orleans, State of LA October 29, 2015 .

Clerk's Office, Room 402, Civil Courts
421 Loyola Avenue
New Orleans, LA

DALE N. ATKINS, Clerk of
The Civil District Court
for the Parish of Orleans
State of LA

by _____
Deputy Clerk

---

### SHERIFF'S RETURN
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ | On this _____ day of _____ |
| _____ served a copy of the w/i petition | _____ served a copy of the w/i petition |
| PET FOR DAMAGES W/OPPOSITION & NOTICE ATTACHED | PET FOR DAMAGES W/OPPOSITION & NOTICE ATTACHED |
| On | On |
| GENERAL ELECTRIC COMPANY | GENERAL ELECTRIC COMPANY |
| THROUGH: ITS AGENT FOR SERVICE OF PROCESS | THROUGH: ITS AGENT FOR SERVICE OF PROCESS |

by leaving same at the dwelling house, or usual place of abode, in the hands of _____
a person of suitable age and discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating HIM / HER the said _____
GENERAL ELECTRIC COMPANY

Returned same day

_____ No. _____

Deputy Sheriff of _____

Mileage: $ _____

_____ / ENTERED / _____
PAPER RETURN

_____ / _____ / _____
SERIAL NO. DEPUTY PARISH

being absent from the domicile at time of said service.
Returned same day

_____ No. _____

Deputy Sheriff of _____

FILED

2015 OCT 28 P 3 08

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA                   DISTRICT COURT

NUMBER:                    DIVISION " "                    SEC: " "

WILLIAM C. BELL

versus

ASBESTOS DEFENDANTS: FOSTER WHEELER ENERGY CORPORATION (formerly
FOSTER WHEELER CORPORATION); CBS CORPORATION (f/k/a WESTINGHOUSE
ELECTRIC CORPORATION); YORK INTERNATIONAL CORPORATION (as successor in
interest to YORK CORPORATION); COOPER INDUSTRIES, LLC (f/k/a COOPER
INDUSTRIES, INC., f/k/a THE COOPER-BESSEMER CORPORATION); GENERAL
ELECTRIC COMPANY; IMO INDUSTRIES, INC. (f/k/a IMO DELAVAL, INC., f/k/a
TRANSAMERICA DELAVAL, INC., f/k/a DELAVAL TURBINE, INC.); WARREN PUMPS,
LLC; BUFFALO PUMPS, INC.; PENTAIR FLOW TECHNOLOGIES, LLC (F/k/a PENTAIR
PUMP GROUP, INC., successor-in-interest to AURORA PUMP CO.); GOULDS PUMP,
INCORPORATED; CRANE CO.; WEIR VALVE & CONTROLS USA (f/k/a ATWOOD &
MORRILL CO., INC.); CONTINENTAL MOTORS, INC. (as successor in interest to GRAY
MOTOR CORPORATION)

FILED:_____          _____
                                        DEPUTY CLERK

## PETITION FOR DAMAGES

The petition of William C. Bell, a person of the full age of majority and resident of the

State of Louisiana, with respect represents:

1.

Foster Wheeler Energy Corporation has its principal place of business in Orleans Parish.

Thus, venue is proper in Orleans Parish pursuant to Louisiana Code of Civil Procedure articles 42

and 73.

2.

Defendants, CBS CORPORATION (f/k/a WESTINGHOUSE ELECTRIC

CORPORATION); YORK INTERNATIONAL CORPORATION (as successor in interest to YORK

CORPORATION); COOPER INDUSTRIES, LLC (f/k/a COOPER INDUSTRIES, INC., f/k/a THE

COOPER-BESSEMER CORPORATION); GENERAL ELECTRIC COMPANY; IMO

INDUSTRIES, INC. (f/k/a IMO DELAVAL, INC., f/k/a TRANSAMERICA DELAVAL, INC., f/k/a

DELAVAL TURBINE, INC.); WARREN PUMPS, LLC; FOSTER WHEELER ENERGY

CORPORATION (formerly FOSTER WHEELER CORPORATION); BUFFALO PUMPS, INC.;

PENTAIR FLOW TECHNOLOGIES, LLC (F/k/a PENTAIR PUMP GROUP, INC., successor-in-

interest to AURORA PUMP CO.); GOULDS PUMP, INCORPORATED; CRANE CO.; WEIR

VALVE & CONTROLS USA (f/k/a ATWOOD & MORRILL CO., INC.); CONTINENTAL

MOTORS, INC. (as successor in interest to GRAY MOTOR CORPORATION) (hereinafter

collectively referred to as "asbestos defendants"), are all corporations incorporated under the laws

of the various states of the United States.  Asbestos defendants all have their principal place of business in various states of the United States.  All of them may be served under and by virtue of the Long Arm Statute of the State of Louisiana, either through their authorized agents, servants, and/or employees, or through the Secretary of State, State of Louisiana.

3.

William Bell served in the United States Navy from approximately 1960 through 1968. While in the United States Navy, he served aboard various vessels, including the USS NOBLE, the USS GRAPPLE, the USS BAINBRIDGE, and the USS SAMUEL N. MOORE.  During his Navy service, William Bell was exposed to asbestos manufactured, sold, and distributed by the "asbestos defendants."

4.

As a result of these exposures to asbestos, Mr. Bell contracted mesothelioma, which was first diagnosed on approximately September 3, 2015.

5.

All defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Mr. Bell and for which these defendants are strictly liable.

6.

As a result of the acts of negligence, intentional tort, fraud, and strict liability of all of the hereinabove named defendants, Mr. Bell contracted asbestos-related mesothelioma, cancer, and other related ill health effects as a result thereof, for which all defendants are jointly, severally, and in solido liable.

7.

During William Bell's exposure, defendant, Westinghouse Electric Corporation (now CBS Corporation, hereinafter "Westinghouse"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials for use aboard the vessels on which William Bell served as well as to land-based locations where William Bell served while in the United States Navy.  Such products were installed, removed, and repaired by or in close proximity to William Bell during his service, thus exposing him to asbestos dust released by the installation, removal, and repair of said products.  Throughout the time Mr. Bell served in the United States Navy, he was exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by Westinghouse.  At the time he was exposed to these products, they

- 2 -

were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of Westinghouse. Additionally, Westinghouse, including Westinghouse employees, performed contracting activities at the locations where William Bell served, which contracting activities also exposed him to asbestos. Thus, Westinghouse not only maintains liability as a manufacturer, seller, and/or distributor of asbestos products, but also as a contractor disturbing asbestos in the vicinity of William Bell.

8.

The asbestos-containing products manufactured, distributed and/or sold by Westinghouse were unreasonably dangerous *per se*, unreasonably dangerous, were defective in design, and constituted a breach of warranty from said manufacturers. Further, Westinghouse failed and refused to warn Mr. Bell of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

9.

Plaintiff further alleges that Westinghouse has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

10.

By the early 1940s, Westinghouse knew that exposure to asbestos could cause lung disease, asbestosis, lung cancer, and mesothelioma. Throughout the 1930s, 1940s, and 1950s, Westinghouse was a member of the IHF, American Ceramic Society and National Safety Council. Beginning in the 1930's, Westinghouse received asbestos scientific and medical information through these organizations.

11.

The "Air Hygiene Foundation", was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburgh). The organizations' name was changed to "Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health Foundation." J-M joined in 1936. IHF members included, among others, General Electric Company, Westinghouse Electric Corporation, or their predecessors in interest. These companies are defendants in this case. The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place. One of the

- 3 -

functions of the IHF was to gather and disseminate information regarding occupational health to its members. Since its inception, it has published special bulletins on items of general interest under the headings of legal bulletins, medical bulletins, management bulletins and engineering bulletins. Since 1937, member companies have been kept informed on occupational health issues by the Industrial Hygiene Digest, a monthly publication which is sent to all members in return for their annual membership fee. The Digest is a compilation of abstracts, grouped by topic, of the published domestic and foreign scientific and medical literature pertaining to industrial health and hygiene. In addition to scientific abstracts, the Digest included a section on legal developments, and also provide notice of any proposed changes in threshold limit values for various substances. Correspondence between members and the IHF established that members either participated in or knew of a number of studies and surveys dating as far back as the 1930's which had linked asbestos with various lung diseases. As part of its consultative services for its members, the IHF undertook a number of studies involving evaluations of asbestos dust conditions and asbestos-related disease. In 1947, the fruits of an industry survey conducted by the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for Asbestos Textile Institute." The report is dated June 1947. The object of the investigation was stated as: "defining the specific nature and the magnitude of the (asbestosis) problem in all its phases....An original objective of most immediate importance was to facilitate the exchange of information between member companies on successful methods of dust control and otherwise to promote a general improvement in that field." The preliminary survey to be divided into three parts designated as "Engineering, Medical and Physical Testing" was based on visits made to member companies' plants over a three month period." While the actual report does not reveal the identity of the plants which were visited, deposition testimony of Dr. Braum indicates that other companies evaluated in the report included defendants in this case. Minutes of the Air Hygiene Committee meetings throughout the 1940's and 1950's reflect frequent discussions and presentations pertaining to appropriate medical practices and industrial hygiene approaches to the problem of asbestos dust in the work place. It was continually stressed that both pre-employment and periodic follow-up medical examinations were essential to monitor the health of employees, the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of asbestos-related disease. Some annual meetings apparently were held by the IHF. The minutes for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest. An

- 4 -

Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed inter alia dust particle size and dust control. A second report by Foundation Research at the Saranac Laboratory entitled "Individual Susceptibility to Toxic Dusts", authored by Dr. Leroy Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on Workers' Compensation cases. A case involving the death of a North Carolina man was discussed, the minutes indicating that the claimant sought compensation on grounds that the defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also recommended that pre-employment and periodic chest x-rays be conducted by a reputable radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the levels of dust in the air, and that various procedures be implemented to reduce the dust in manufacturing facilities. In December of 1946, Mr. Hemeon of the Industrial Hygiene Foundation was invited to attend a meeting of the American Textile Institute (discussed infra) to respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member companies. It was agreed at the February 5, 1947, meeting of the American Textile Institute (ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W. C. L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of asbestosis ranging between 3% and 20%. In one presentation at a regular meeting (prior to 1950) of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed to asbestos fiber. Defendants thus had direct and actual knowledge that the suggested threshold limit value for asbestos was not safe. In addition, this criticism was published in the scientific literature and all defendants were put on notice of the hazards of the suggested threshold limit value.

12.

In addition, Westinghouse and/or its medical director and industrial hygienist became members of the Konicide Club from 1932 through 1940. The Konicide Club was created to understand and control the dust related diseases in the industry, and the members would meet to discuss the methods of accomplishing these goals. On January 22, 1939, The Konicide Club even conducted a meeting which focused on the health problems of the asbestos industry in particular.

13.

Also, Westinghouse's industrial hygienist, E.C. Barnes, wrote to Westinghouse's medical department in the 1940s regarding the high dust levels associated with asbestos cloth and the mixing of asbestos cement. Barnes further explained that the inhalation of asbestos dust could cause asbestosis, and he recommended that this hazard be minimized. Westinghouse was also aware of the dust problems associated with the use of the asbestos cloth on turbines. However, from 1946 through the late 1970s, Westinghouse failed to control or reduce the dust created from the asbestos cloth, cement, and other asbestos-components of its products at the various jobsites, and failed to warn with regard to these hazards.

14.

In 1953, Westinghouse produced its Asbestos Safe Practice Data Sheet, thus further evidencing Westinghouse's knowledge of the hazards associated with asbestos exposure. Also in 1953, Westinghouse acknowledged that it had a duty to warn contractors, who lacked the knowledge of potential hazards. However, Westinghouse still never warned the contractors nor the various jobsites of the hazards associated with exposure to asbestos.

15.

Westinghouse was also aware of the excessive dust produced from its Micarta product during the 1950s, as indicated in a letter from H.W. Speicher to James McClimans, a safety supervisor. In 1973, Westinghouse conducted dust studies at the Micarta facility and recorded high levels of airborne and settle asbestos-containing dust from the circular saw trimming of Micarta. Nevertheless, Westinghouse failed and refused to warn of health hazards of its asbestos-containing Micarta, and suppressed this information.

16.

Additionally, Westinghouse knew that asbestos was dangerous in the 1940s and began a program to clean up the manufacturing process in their plants in the 1950s while continuing to manufacture asbestos-containing products. Westinghouse began manufacturing asbestos-containing wallboard systems in 1956 until the mid 1970s. Prior to 1972, Westinghouse failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration ("OSHA") regulations, Westinghouse applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of Westinghouse's asbestos-containing products. Subsequent to this activity,

Westinghouse learned through in-house counsel that there existed numerous documents that would implicate Westinghouse for its actions. These documents reflected early knowledge on the part of Westinghouse and contained product manufacturing information, air samples studies, architectural reports, work papers, old work files, and other similar materials. It was determined that all such documents be destroyed, despite Federal Regulations requiring their retention. This document destruction was done with the specific intention of defrauding asbestos victims and the courts before which Westinghouse would undoubtedly appear. In the past, Westinghouse has refused to respond to plaintiff's request for the production of these documents principally on the basis that said documents did not exist due to their destruction. Accordingly, plaintiff alleges that Westinghouse's conduct constitutes fraud.

17.

Additionally, even when OSHA cited Westinghouse with willful, asbestos-related violations during 1970s at its Hampton Micarta plant and in the 1980s at the Lester turbine and blanket plant. Regarding these incidents, Westinghouse's attorneys maintained that Westinghouse would not comply with either the EPA or OSHA and would take an attitude of "respectful noncompliance".

18.

Westinghouse has engaged in a pattern of suppressing information with regard to its asbestos-containing products and the health hazards associated with same. Jeffrey J. Bair of Westinghouse states in what is known as "The Smoking Gun" documents that the Industrial Hygiene Department files, dating back to 1930, have been reviewed. After a general description of the categories of documents reviewed, Mr. Bair provides a discussion of the nature of these documents. The following are quotes from that discussion:

> The majority of the documents in Industrial Hygiene's files are potential "smoking gun" documents. This is so because of the nature, duties, obligations and responsibilities of the Industrial Hygiene Department. The approximately 57 years of Industrial Hygiene files which are in existence today are filled with technical information, procedural information, safe-handling information, hazard information, recommendations and tests results. The files are filled with documentation which critiques and criticizes, from an industrial hygiene perspective, Westinghouse manufacturing and non-manufacturing operations. This documentation often times points out deficiencies in Westinghouse operations and suggests recommendations to correct these deficiencies. Industrial Hygiene's files contain information which details the various chemical substances used at Westinghouse sites over the years, and often times the inadequacies in Westinghouse's use and handling of the substances. The files contain many years of employee test results, some of them unfavorable. Industrial Hygiene, by performing its job, creates, daily, potential smoking gun documents (emphasis added).

Plant Correspondence and Files

Please see, for example, Wilber Speicher's letter...correspondence of this type was and continues to be, frequently generated by Industrial Hygiene. Dr. Speicher's correspondence might show early knowledge of the Corporation to certain health hazards associated with epoxy resin dissolving agents. What use did the Corporation make of this knowledge to protect employees and the public? If none or very little, then this document might become a "smoking gun" (emphasis added).

Industrial Hygiene audit and trip reports certainly qualify as potential smoking guns (emphasis added). Industrial Hygiene, in each plant audit, critiques and criticizes the facility from an industrial hygiene perspective. Industrial Hygiene also makes recommendations to improve the hygiene of the plant. The smoking gun possibilities of such documentation are readily apparent (emphasis added). Material Cards, Materials Safety Data Sheets, Purchasing [sic] Department Specification Cards, Safe Practice Data Sheets and Historical Safe Practice Data Sheet Files

Again, the smoking gun possibilities of these documents are clear. If, for example, the safe practices detailed in safe practice data sheets are not made a part of a site's industrial hygiene program and communicated to employees, the potential future problems are readily apparent. In addition, if the information is not or was not conveyed to customers, the public, etc., again the potential future problems are readily apparent (emphasis added).

Recommendations

Plant Correspondence Files (excluding air sampling data and employee test results such as bio-assay, radiation, etc.)

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic records retention guidelines do not specifically address these records. We recommend that all such files generated prior to 1974 should be discarded. As stated before, these records are filled with documentation dating back to the 1930's which critiques and criticizes Westinghouse operations, and points out deficiencies in such operations. The files are filled with technical product and chemical information, hazard information and safe-handling information, most of it generated by the industrial Hygiene Department in a "editorializing" and opinionated manner. The files are not used in the daily operation of the Department. In our opinion, the risks of keeping these files on the whole substantially exceed the advantages of maintaining the records for the following reasons:

The substantial bulk of the correspondence was written by the Department in an editorializing, opinionated and verbose manner, instead of strictly factual. In addition, the Industrial Hygiene Department, prior to 1974, was involved in testing and evaluating the safety of everything from water coolers to gloves. From a review of the files, it appears that the Department commented and editorialized on just about everything which might have been found in the workplace. This "self-analysis" and "editorializing" type of information can be dangerous. This is just the type of documentation which should be discarded from the files. Correspondence generated subsequent to 1974, generally speaking, does not suffer from these drawbacks.

"Historical Files or Industrial Hygiene Department"

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic Records Retention Guidelines do not specifically address these records. We recommend that, with the exception of the 1974 noise survey and the testing date which is contained in these files, these files be discarded.

Bair's Conclusions

Toxic tort litigation, including toxic tort-related workmen's compensation
litigation, show no signs of abating in the near future. In fact, legislation such as
the risk notification legislation currently being considered by Congress, will,
according to many "experts", result in an increase in such litigation.
Consequently, well reasoned and conceived document retention and destruction
programs for departments such as Industrial Hygiene, and in fact the entire
Corporation, are imperative.

Bair's conclusion clearly shows that Westinghouse fraudulently destroyed relevant

documents all in furtherance of its fraudulent activities whereby it misrepresented the dangers of

its asbestos-containing products in order to gain a commercial advantage, *i.e.* sell more of its

dangerous products. More importantly, his conclusion shows that Westinghouse had motive for

destroying the documents, which was *avoiding litigation* and having to answer fraud allegations

therein.

19.

It is well-settled that parties have a duty to preserve discoverable evidence, both during

and prior to litigation, if it is reasonably foreseen that litigation will occur. Westinghouse knew

litigation was likely to occur and destroyed their documents in anticipation therof. This activity

amounts to fraud and spoliation. In fact, at least one court has already found that the activities set

out in the Jeffrey Bair memo demonstrate a "plan to commit a fraud on the Courts of the United

States."

20.

The document destruction program set out in Bair's memo was <u>actually implemented</u> by

Westinghouse, as is evidenced by a memorandum entitled "Document Retention" that was

written by Wayne C. Bickerstaff on January 29, 1988, directed to J.W. Fisch and copied to S.R.

Pitts and Jeffrey Bair. On March 3, 1988, Jeffrey Bair wrote another memo, indicating that he

had "informed Wayne to begin discarding [certain documents]." These acts of intentional

destruction of records by Westinghouse in order to avoid public knowledge that it had knowledge

of health hazards associated with its products constitute fraud under the laws of the state of

Louisiana.

21.

During William Bell's exposure to asbestos, defendant, General Electric ("GE"), was in

the business of manufacturing, selling and/or distributing asbestos-containing materials for use

aboard the vessels on which William Bell served and/or to land-based locations where William

Bell served while in the United States Navy. Such products were installed, removed, and repaired

- 9 -

by or in close proximity to William Bell during his employment, thus exposing them to asbestos dust released by the installation, removal, and repair of said products. Throughout the time he was employed, Mr. Bell was exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by GE. At the time of his exposure to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of GE. Additionally, GE, including GE employees, performed contracting activities at the locations where William Bell served, which contracting activities also exposed him to asbestos. Thus, Westinghouse not only maintains liability as a manufacturer, seller, and/or distributor of asbestos products, but also as a contractor disturbing asbestos in the vicinity of William Bell.

22.

The asbestos-containing products manufactured, distributed and/or sold by GE were unreasonably dangerous, unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers. Further, GE failed and refused to warn Mr. Bell of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

23.

Plaintiff further alleges that General Electric has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

24.

Furthermore, as scientists became more concerned with the connection between asbestos and occupational exposure, General Electric, along with others in the asbestos industry, sponsored both animal and human research on the biological effects of asbestos at the Saranac Laboratory of the Trudeau Foundation. General Electric's association with the Saranac Laboratory extends at least to the 1940s, where Saranac Laboratory correspondence documents the contractual relationship between the Laboratory and General Electric. This research performed by the Saranac Laboratory revealed that exposure to asbestos produced harmful effects to those individuals who inhaled asbestos dust. More specifically, the Saranac Laboratory held the Seventh Saranac Symposium in 1952, whereupon General Electric representatives attended.

The presentations by various doctors indicated that a link existed between asbestos and several lung diseases, including asbestosis and lung cancer.

In his presentation at the Seventh Saranac Laboratory in 1952, Dr. Kenneth M. Lynch indicated that he tested the effects of asbestos from a period of twenty five years (1926-1950). The testing resulted in the knowledge of a causal relationship between asbestos and cancer in 1934. This discovery was formally set in a published record. Additionally, in 1947, Dr. Lynch discovered that 13.2% of persons suffering from asbestosis also developed cancer. Furthermore, Dr. Lynch spoke of several reports, dated from 1918 to 1952, discussing the association of cancer with asbestos.

Also, Dr. Merewether began noting the deaths from asbestos exposure in the United Kingdom during the years of 1924 to 1947, including asbestos with tuberculosis and asbestos with lung cancer. Dr. Merewether discovered that 16.2% of persons suffering from asbestosis also developed cancer, as apposed to the 13.2% found earlier, thus further indicating a causal relationship between exposure to asbestos dust and lung cancer. In addition, Dr. Merewether discussed the original cases of asbestosis discovered around 1902. Another doctor, Dr. Arthur J. Vorwald, discussed the discovery of asbestosis in the early 1900s and the availability of information concerning the disease through several reports, ever since. Dr. Vorwald also admitted that individuals exposed to asbestos fibers develop asbestosis. Thus, General Electric's attendance at the Seventh Saranac Symposium in 1952 indicates that it knew, or at least should have known, of the hazardous nature of asbestos in causing asbestosis and lung cancer. Despite this knowledge, General Electric failed to warn its workers and customers of the harmful effects that result from the inhalation of asbestos fibers.

25.

General Electric contracted Harvard University to conduct research regarding the various hazards existing in their plants. Dr. Alice Hamilton, along with other Harvard medical doctors, conducted the research for General Electric. She recommended that chest x-rays be taken of all employees working with asbestos. She additionally recommended an overhaul in the ventilation system on certain apparatus at their plants due to the hazardous nature of asbestos fibers and the fact that moving belts blew the asbestos dust about the room so that it accumulates in the room. Also, in the 1930s, asbestos victims began to sue Johns-Manville and Multibestos because of their asbestos-related illnesses. As a result, Dr. Hamilton wrote to Gerald Swope, President of General Electric, informing him that these suits were justified. She further recommended that

- 11 -

General Electric take safety precautions, including an evaluation of the situation and dust counts, to avoid this litigation.

Furthermore, Carl Obermaier, a GE plant manager, wrote to Hamilton acknowledging/admitting that he knew that inhalation of asbestos dust caused health problems, mainly asbestosis. Furthermore, Obermaier spoke of reports and pamphlets discussing the connection between asbestos exposure and lung cancer. Several letters, dated years 1928 - 1934, between Hamilton and GE indicate that GE was well aware of the excessive asbestos dust contained inside their various plants. Thus, GE had knowledge that asbestos dust was harmful, but still refused to warn its employees and its customers to whom it sold its asbestos-containing products.

26.

Throughout the relevant time periods, GE conducted various asbestos tests in their different plants, further indicating that they knew that asbestos was hazardous since they tested for levels of asbestos dust. Also, when tested, several times GE ran well above the maximum allowable level. For example, a survey done in 1973 of several GE plant buildings found an asbestos dust concentration count of 1540 fibers greater than five microns per milliliter of air, when the threshold limit value for asbestos at that time was five fibers greater than five microns per milliliter of air. GE was also aware that large quantities of asbestos fiber would blow into the exhaust system. Many times GE chose to use the cheaper asbestos fiber in the plants, even though the cheaper fiber produced more dust into the exhaust system. However, GE, knowing of the harmful effects of asbestos, still refused to warn those individuals/workers who would come into contact with their products. Instead, they used these cheaper asbestos fibers attempting to profit at the expense of those individuals who would inhale these fibers from their products. As a result of the tests conducted at General Electric's plants, various recommendations were given to GE during the 1950s to 1970s, including the improvement of ventilation (including exhaust systems), periodic chest X-rays, pulmonary function tests, medical surveillance programs, wearing of an approved respirator, gloves, and protective clothing, increasing air flow, better maintenance of dust filters, use of industrial vacuum to clean site, complete enclosure of saw and apparatus, checking filters at regular intervals to insure working properly, and the cutting of cloth where asbestos dust should be minimized. More specifically, in letters dated 1956 and 1959, Dr. Elkins informed the GE Lowell Plant that those employees working around asbestos should receive periodic chest x-rays due to the hazardous nature of asbestos. Also, he

- 12 -

informed that the workers who sweep the area should wear respiratory equipment. Therefore,

General Electric knew or should have known that asbestos could be harmful to those individuals

exposed to this dust.

27.

Moreover, various published reports and articles available to GE, prove that GE was

empowered with the knowledge that asbestos caused several diseases. Some of the reports and

articles include:

(1)     Safety Management: Accident Cost and Control, a published article written in
1956 by Dr. R. Simonds and Dr. J. Grimaldi, which discusses the fact that asbestos
produces asbestosis, the symptoms of asbestos, and how asbestos dust can be found in all
stages of asbestos handling;

(2)     Asbestos-Dust Exposures at Various Levels and Mortality, a published article
written in 1967 by Dr. P. Enterline and Dr. A. Kendrick discussing the first reports of
asbestosis in the early 1900s, the first reports of mesothelioma were published in 1955,
and the acceptance of a causal relationship between asbestos dust and asbestosis and
mesothelioma;

(3)     Asbestos Exposure Smoking, and Neoplasia, a published article written in 1968
by Dr. I. Selikoff, Dr. E. C. Hammond, and Dr. Jacob Churg, discussing that asbestos
workers have a high risk of dying of bronchogenic carcinoma.

(4)     Industrial Pneumoconiosis Prevention and Control, an published article written in
1969 by Edmund M. Fenner, director of environmental control at J-M, talks about how
scientists became concerned about the connection between the exposure to asbestos fibers
and asbestosis in the 1920s. Furthermore, the article speaks of the Saranac Laboratory's
discovery, through animal and human research in the 1930s, that asbestos exposure did
"produce a unique and identifiable pulmonary fibrosis." Additionally, the article also
talks about how Britain had become concerned about the link between asbestos dust
exposure and lung cancer in the 1950s.

(5)     Asbestos And Health In 1969, a published article written in 1969 by George W.
Wright, discusses the progression of knowledge about asbestos' relationship with
different diseases. Wright begins by talking about the discovery of diseases associated
with asbestos exposure in the early 1900s. Then, Wright mentions that in the 1930s, it
was pointed out that asbestos poised a problem to the health of workers and that the
health problem could be minimized by instituting protective measures to reduce the
amount of asbestos airborne dust. Wright also speaks about the various tests conducted
to determine the exact relationship between asbestos and diseases. Additionally, Wright
indicates that an 80% incidence of asbestosis to workers exposed to asbestos 20 or more
years was found, and also that the more asbestos dust concentration in the air the larger %
of workers developing cancer. Furthermore, Wright explains that there is a strong
relationship between the development of mesothelioma and the exposure to asbestos
fibers.

(6)     The Health of Chrysotile Asbestos Mine and Mill Workers of Quebec, a published
article written in 1972 by Dr. C. McDonald, Dr. M. Becklake, G. Gibbs, Dr. A.
McDonald, and C. Rossiter, talks about how asbestos has been known to cause three
identifiable diseases, including asbestosis, lung cancer, and mesothelioma. The article
also discusses the fact the percent of people who develop lung cancer rises with the
increase in asbestos dust exposure.

(7)     Recommended Safety Practices for Handling Asbestos Fiber, an article written by
Johns-Manville indicating that asbestos should be handled in a way as to prevent asbestos
dust and that approved asbestos respirators should be worn by when handling asbestos
fibers.

- 13 -

(8)    Encyclopedia Of Occupational Health And Safety, written in 1971 by J.C. Gilson, talks about the health hazards, including several diseases, associated with the inhalation of asbestos fibers and asbestos dust. The Encyclopedia also speaks of the first incidence of asbestosis discovered in 1899 in London and the fact that in the 1930s asbestos was seen as a major cause of health hazards in the asbestos textile industry in the U.S. and other countries.

28.

CBS CORPORATION (f/k/a WESTINGHOUSE ELECTRIC CORPORATION); YORK

INTERNATIONAL CORPORATION (as successor in interest to YORK CORPORATION);

COOPER INDUSTRIES, LLC (f/k/a COOPER INDUSTRIES, INC., f/k/a THE COOPER-

BESSEMER CORPORATION); GENERAL ELECTRIC COMPANY; IMO INDUSTRIES,

INC. (f/k/a IMO DELAVAL, INC., f/k/a TRANSAMERICA DELAVAL, INC., f/k/a DELAVAL

TURBINE, INC.); WARREN PUMPS, LLC; FOSTER WHEELER ENERGY CORPORATION

(formerly FOSTER WHEELER CORPORATION); BUFFALO PUMPS, INC.; PENTAIR

FLOW TECHNOLOGIES, LLC (F/k/a PENTAIR PUMP GROUP, INC., successor-in-interest to

AURORA PUMP CO.); GOULDS PUMP, INCORPORATED; CRANE CO.; WEIR VALVE &

CONTROLS USA (f/k/a ATWOOD & MORRILL CO., INC.); CONTINENTAL MOTORS,

INC. (as successor in interest to GRAY MOTOR CORPORATION) manufactured, distributed,

and/or sold various asbestos-containing products, including but not limited to turbines, engines,

boilers, heaters, pumps, valves, compressors, asbestos-containing pipe covering, blankets, special

fittings, gaskets, packing, blocks, cements, mastics, and jackets. They sold these products

throughout the time that William Bell was serving in the United States Navy aboard the vessels

identified above. In addition, General Electric, Westinghouse, and Foster Wheeler also did

contracting work at locations at which Mr. Bell served, thereby exposing him during their

handling of these products.

29.

The asbestos-containing products manufactured, distributed and/or sold by all "asbestos

defendants" were unreasonably dangerous, unreasonably dangerous per se, were defective in

design, and constituted a breach of warranty from said manufacturers. Further, defendants failed

and refused to warn Mr. Bell of the danger of exposure to such products. They also failed to

warn of the invisible nature of the asbestos and that it could cause diseases such as

mesothelioma, cancer, asbestosis, pleural diseases, and other ill health effects.

30.

As a result of the defective and unreasonably dangerous condition and composition of the

asbestos-containing products manufactured, distributed, and/or sold by the "asbestos defendants,"

- 14 -

Mr. Bell inhaled asbestos fibers and other harmful substances emitted by the normal use of said products, proximately causing the mesothelioma, cancer, and other related ill health effects from which he suffers. Plaintiff further contends that said "asbestos defendants" are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

31.

Prior to the time Mr. Bell was exposed to asbestos, all defendants were aware or should have been aware of the health hazards associated with exposure to asbestos, including but not limited to pleural plaques, fibrosis, asbestosis, cancer, and mesothelioma. Further, all defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceased; nevertheless, defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims. Such conduct constitutes fraud.

32.

All defendants made the misrepresentations cited in the foregoing paragraph despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

33.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Mr. Bell was exposed to products manufactured, distributed, and sold by "asbestos defendants," and he contracted mesothelioma, cancer, and other related ill health effects, which was first diagnosed on approximately September 3, 2015.

34.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Bell, and others

- 15 -

who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured persons and claims from family members who also contracted disease.

35.

The health hazards of asbestos have been recognized by those in the business for two thousand years. The Greek geographer Strabo and the Roman historian Pliny the Elder both recognized asbestosis in slaves whose task was to weave asbestos into cloth. There is conclusive evidence (more specifically outlined below) that by the end of 1930, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause asbestosis and cancer, that asbestosis was a fatal disease, and that the latency period of asbestosis and other asbestos-related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Mr. Bell.

36.

By the time Mr. Bell began working with and around asbestos products, virtually every state in the Unites States recognized asbestosis and silicosis as compensable claims under workers' compensation laws. In fact, the Louisiana legislature in 1952, when it enacted its first Workers' Compensation Occupational Disease Act, listed asbestosis and silicosis as a compensable occupational disease. Moreover, all suppliers (as well as independent contractors) to any company with government contracts were bound to comply with health and safety requirements of the Walsh Healey Public Contract Act first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. They also required isolation of dusty work, ventilation, use of respirators, and medical examinations by doctors. Despite this, Mr. Bell was never warned of any hazard associated with asbestos, was never protected by use of adequate ventilation, and was required to work next to insulators using asbestos products. He never saw a warning on any asbestos product nor was he warned by any contractor using asbestos products. Despite the fact that all defendants were aware of the hazards of asbestos to which Mr. Bell was exposed, they failed and refused to warn of these dangers and, furthermore, concealed these hazards. Moreover, defendants suppressed

and prevented the dissemination of information relating to the hazards of asbestos exposure, thus constituting fraud.

37.

The acts of the defendants, as described above, constitute a fraudulent misrepresentation and/or concealment which proximately caused the injuries to the Petitioners in the following manner:

1)   The material published or caused to be published was false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products;

2)   The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:

   a)   To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;

   b)   To assist in the continued pecuniary gain of the defendants through the sale of asbestos products to an ignorant public;

   c)   To influence in the defendant's favor, legislation to regulate asbestos exposures and unlimited medical and disability claims for compensation;

   d)   To provide a defense against lawsuits brought for injury resulting from asbestos disease;

   e)   To prevent relevant medical inquiry about asbestos disease;

   f)   To mislead the general public, and the Petitioner herein, about the hazards associated with asbestos products; and

   g)   To induce the Petitioner to use and continue to use asbestos products.

3)   The Petitioner reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products because Petitioner believed it to be safe.

4)   Defendants, intended the Petitioner to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and therefore to continue their exposure to those products.

5)   Defendants are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Petitioner and others deciding to use the said asbestos-containing products to which Petitioner was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

38.

Insurance premiums were set based on the risks posed by the insured.  Insurance companies discussed the hazards of asbestos with insured who manufactured, used, or distributed asbestos products.  Insurance field inspectors would survey the premises or operations of the insured, advise the insured of the hazard, and set the premium accordingly.  This was true prior to the time that Mr. Bell was first exposed to asbestos and continued throughout his employment.  The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting.  When the Supreme Court of North Carolina (*McNeely v. Carolina Asbestos Co.*, May 23, 1934) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the McNeely case and others like it injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at practicable rates."; he wrote that even though rates for those in the asbestos business were high, "their adequacy ... is generally doubted."  To avoid losing money, insurance companies instituted a practice of servicing claims as well as providing the insurance--"sort of a right pocket to left pocket...in other words there wasn't any way (insurance companies) could lose money on it."  (See deposition of Harry J. Flynn in Bradley v. Todd Shipyards, Inc., C.A. No. 85 - 05657, Div. "D", Civil District Court for the Parish of Orleans.)

39.

That all defendants and the companies that insured them knew of the health hazards associated with exposure to asbestos since the 1930s (and suppressed this information) is shown by numerous documents and testimony.  In fact, the knowledge was so well recognized in the asbestos industry that the insurance industry considered confessing liability; instead, they decided to make it "economically impossible" for plaintiffs to pursue their claims.  The minutes of meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry association) confirm that the hazards of asbestos exposure have been known for many years.  These minutes specifically state that  medical research in 1900 linked asbestos with asbestosis and by 1935 it was recognized that asbestos caused cancer.  In a memorandum of a meeting of a discussion group dated April 21, 1977, it was stated:  The meeting closed with a unanimous rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed between themselves as to their respective losses and expenses.  That insurance companies and

their insureds were working together to discourage plaintiffs from pursuing valid claims is also

demonstrated in earlier memos. In minutes dated May 22, 1974, discussing *Borel v. Fibreboard*

*Paper Products Corporation*, 493 F.2d 1076, (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974), it

is stated: "The appeals court decision in the Borel case of course sets a very bad precedence for

our other pending asbestosis cases and (sic) this jurisdiction we will soon have to formulate a

**'game plan'** for the continued defense of these asbestosis cases **with the other defendants."** In a

memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance

companies would resist pending cases "and attempt to make this economoically (sic) impossible

for the plaintiffs to pursue the other cases." These attempts to prevent and stifle valid claims by

plaintiffs such as Mr. Bell and plaintiff herein shows that the defendants, to this day, are

committing fraud.

40.

Documents and testimony of defendants herein as well as associated asbestos companies is

replete with the fact of knowledge and fraud. Although Johns-Manville (hereinafter sometimes

referred to as "J-M" and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M")

are not defendants herein, a discussion of their knowledge is necessary to show knowledge within

asbestos industry associations, within the insurance industry, and among other defendants. In

1929, Johns-Manville Corporation and Raybestos-Manhattan, Inc. agreed to permit the

Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some

of their facilities, including J-M's asbestos mines and mills in the Province of Quebec. The initial

investigation began in October of 1929 and was completed in January of 1931. The study

included the following: a survey of the dust conditions in the asbestos mines, mills and

fabricating plants; physical examinations of asbestos workers, including X-ray films; and a study

of the dust exhaust systems designed to eliminate asbestos dust. This survey was supervised by

Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell,

Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan.

Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W. R. Seigle

(Vice President of J-M), Vandiver Brown (General Counsel for J-M), S. A. Williams (President of

Johns-Manville Products Corporation), and Sumner Simpson (President of Raybestos-Manhattan,

Inc.). The minutes of these meetings which occurred in November, 1933, through January, 1934,

reflect that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M

facilities, as well as expanding the scope of the study to include additional J-M facilities and

facilities of other members of the asbestos industry. Dr. Lanza felt that the Metropolitan Life

- 19 -

Insurance Company should advise the companies of the types of respirators which should be provided to the employees engaged in making a study of this problem. On December 7, 1934, Dr. Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof" of the results of the 1929 through 1931 survey of the R-M and J-M plants, entitled "Effects of Inhalation of Asbestos Dust on the Lungs of Asbestos Workers." This "draft" was also circulated to representatives of Raybestos-Manhattan, who prepared editorial comments and recommendations for Dr. Lanza concerning the final publication of the report. Johns-Manville prepared similar comments. The Metropolitan report informed Raybestos-Manhattan and Johns-Manville of the following: that prolonged exposure to asbestos dust caused pulmonary fibrosis; that asbestosis could cause cardiac enlargement; that it was possible for uncomplicated asbestosis to have fatal results; and that the amount of dust in the air in the asbestos plants surveyed could be substantially reduced. After incorporating some of J-M's and R-M's editorial suggestions, Dr. Lanza published "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers" in the Public Health Reports, Volume 50, No. 1, January 4, 1935.

41.

In November 1936, Vandiver Brown of Johns-Manville, together with Sumner Simpson, President of Raybestos-Manhattan, solicited other members of the Asbestos Products Industry to participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute. Dr. Leroy U. Gardner was the director of the Trudeau Foundation at the time. A report of these works was prepared by Dr. Gardner on April 18, 1938. The report was sent to Vandiver Brown, who in turn sent it to Dr. Lanza for his comments.

42.

In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and Rubber Company's Paterson, New Jersey plant, he had observed a significant number with lung changes which he believed were due to asbestos exposure. Dr. Roemer advised that the men be informed of his findings and that they be instructed to secure outdoor employment which did not involve any exposure to asbestos dust. Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease. Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of x-ray evidence of asbestos disease among workers, but told Mr. Roemer and the UNARCO representatives that it was foolish to be concerned. Mr. Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather than inform them of health consequences which would undoubtedly lead to costly lawsuits against the company. As testified to by Mr. Roemer, "I'll

never forget, I turned to Mr. Brown... and I said, 'Mr. Brown, do you mean to tell me you would let them work until they dropped dead?' He said, "Yes. We save a lot of money that way.'" (Deposition Charles H. Roemer taken April 25, 1984, Johns-Manville Corp. et al. v. the United States of American, U.S. Claims Court Civ. No. 465-83C).

43.

As a result of the aforesaid Metropolitan Life study, additional health research on the effects of prolonged and excessive inhalation of asbestos fiber on human beings was undertaken at the Saranac Laboratory. A report on this research was delivered at the Seventh Saranac Lake Symposium in 1952 and was entitled "Pulmonary Function Studies in Men Exposed for Ten or More Years to Inhalation of Asbestos Fibers" by Fernand Gregorie and George W. Wright.

44.

In addition to the IHF, there were other trade associations which were formed to aid and service companies in the asbestos industry. Members of the Asbestos Textile Institute (ATI), founded on November 16, 1944, included companies which produced asbestos containing cloth and other products. At the June 13, 1946, meeting of the Asbestos Textile Institute, a question was posed as to whether or not a committee should be formed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control committee of the Asbestos Textile Institute recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people. In 1946, the ATI was presented with a plan for a central medical committee which would call for individual medical programs at all facilities using asbestos as well as a central medical department which would be responsible to the association. Recommendations for initial medical examinations and periodic follow-up examinations were also made. The recommendation for periodic medical examinations was characterized by the presenting doctor as "fundamental in an industry where there was a 'known occupational health hazard'". While the ATI considered this proposal, it nonetheless elected to defer the plan. During the late 1940's and early 1950's, the ATI was presented with a number of other plans for wide ranging research on various issues dealing with asbestos-related disease in the asbestos industry. However, in some instances, the research projects and proposals were discarded.

45.

Another trade organization was the National Insulation Manufacturers Association ("NIMA"), which formed in December of 1958 as a joint venture trade association to serve as a

- 21 -

voice for the mineral insulation industry. After 1958, personnel of Ruberoid/GAF (defendant herein) attended most, if not all, NIMA meetings at which health hazards were frequently the topic of formal discussions. NIMA members had unequivocal knowledge of the potential health hazards posed by unprotected and prolonged exposure to excessive quantities of airborne asbestos fiber. The testimony of Harry Kaufman, who came to Ruberoid in 1958 as Assistant Director of Quality Control, admit knowledge of the potential health hazards to an unprotected worker from exposure to asbestos fiber as far back as 1943 when he attended a five month course at the University of Maryland on Industrial Safety. Charles Limerick, former manager of the Ruberoid Vermont Mines, has admitted that he was aware of dangers of asbestos as far back as the 1930's and 1940's. GAF/Ruberoid was put on notice of dangers in 1935 or 1936 through correspondence with "Asbestos" magazine. Ruberoid subscribed and advertised in "Asbestos". Moreover, Ruberoid was prodded by lawsuits brought by its employees alleging that they had developed asbestosis as early as 1934.

46.

Sumner Simpson, the first Raybestos-Manhattan Incorporated President, maintained a file or collection of documents, correspondence, and memoranda pertaining to the subjects of the health effects of asbestos, dust control, and dust levels. These documents clearly evidence knowledge, beginning in at least the 1930's, of dangers posed by exposure to asbestos and steps which could and should be taken to minimize the risk of asbestos-caused diseases. The "Sumner Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period of time could and would produce asbestos-related diseases. Numerous letters in the "Sumner Simpson" document collection refer to the fact that many states were adding asbestosis as a compensable disease and that Raybestos-Manhattan Incorporated was going to have to deal with that reality.

47.

Since the early 1940s, defendant, Foster Wheeler Energy Corporation (formerly Foster-Wheeler Corporation), was a major manufacturer of boilers, heaters, condensers, and other products used in the construction of both commercial and U.S. Navy vessels. Since that time through and including the time when Mr. Bell was last exposed, they supplied this equipment to virtually every shipyard constructing and repairing vessels in the country. Accordingly, since the early 1940s, they were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed infra). These mandatory regulations addressed asbestos

- 22 -

hazards and asbestosis as a resultant disease of exposure to asbestos. Despite this knowledge, at no time was Mr. Bell advised of these hazards as defendants failed and refused to warn Mr. Bell of the dangers and, furthermore, concealed and suppressed their knowledge of these hazards, thus constituting fraud. In addition to manufacturing and selling boilers, heaters, condensers, and other asbestos equipment, (and providing the asbestos insulation products for insulation of their equipment and the piping connecting their equipment), they constructed and maintained their equipment on-site and provided an on-site representative during the construction and maintenance of their equipment, thus exposing Mr. Bell to asbestos during their operations.

48.

All defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

49.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Mr. Bell was exposed to products manufactured, distributed, and sold by "asbestos defendants," and he contracted mesothelioma, cancer, and other related ill health effects.

50.

As a result of the aforementioned acts of negligence, intentional tort, fraud, and strict liability of all of the hereinabove named defendants, Mr. Bell contracted mesothelioma, cancer, and other related ill health effects.

51.

All of the hereinabove named defendants are jointly, severally, and *in solido* liable to petitioners for the damages sustained as a result of Mr. Bell's contraction of mesothelioma, cancer, and other related ill health effects. Petitioner, William Bell is entitled to damages for the following: past, present, and future physical pain and suffering; past, present, and future mental pain and suffering; fear of death and complications; permanent disability; loss of enjoyment of life and lifestyle; reduction in life expectancy; past, present, and future loss of income and loss of earning capacity; loss of fringe benefits; past, present, and future medical expenses; loss of personal services, costs of care and assistance, costs of custodial care; humiliation, frustration and inconvenience caused by the defendants; increased costs of insurance and other expenses incurred

- 23 -

as a result of his disease; and all other general damages arising out of this action which may be shown at the trial of this matter.

WHEREFORE, petitioner, William Bell, prays that the defendants named herein be duly cited to appear and answer, and that after all due proceedings are had, that there be judgment rendered herein in favor of petitioner and against defendants for all damages suffered by petitioner together with legal interest and all costs associated with the prosecution of this claim. Petitioner further prays for all general and equitable relief.

Respectfully submitted,

**ROUSSEL & CLEMENT**

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JONATHAN B. CLEMENT - 30444
LAUREN R. CLEMENT - 31106
BENJAMIN P. DINEHART - 33096
1550 West Causeway Approach
Mandeville, LA 70471
Telephone: (985) 778-2733
Facsimile: (985) 778-2734
ATTORNEYS FOR PETITIONER,
WILLIAM BELL

**PLEASE SERVE THE PETITION FOR DAMAGES; OPPOSITION TO MOTIONS FOR EXTENSION OF TIME; NOTICE OF VIDEOTAPED PERPETUATION FOR ALL PURPOSES INCLUDING PERPETUATION PURPOSES, ON THE FOLLOWING:**

1.  FOSTER WHEELER ENERGY CORPORATION
    (formerly FOSTER WHEELER CORPORATION)
    Through its registered agent for service of process:
    CT CORPORATION SYSTEM
    3867 Plaza Tower Dr.
    Baton Rouge, LA 70816

2.  GENERAL ELECTRIC COMPANY
    Through its agent for service of process:
    CT Corporation System
    3867 Plaza Tower Dr.
    Baton Rouge, LA 70816

3.  CBS CORPORATION                      **LONG ARM SERVICE**
    (F/K/A WESTINGHOUSE ELECTRIC CORPORATION)
    Through its agent for service of process:
    Corporation Service Company
    2711 Centerville Road, Suite 400
    Wilmington, Delaware 19808

4.  YORK INTERNATIONAL CORPORATION (as successor in interest to YORK CORPORATION)
    Through its registered agent for service of process:
    CT Corporation System
    3867 Plaza Tower Dr.
    Baton Rouge, LA 70816

- 24 -



A TRUE COPY

DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LOUISIANA

5.   COOPER INDUSTRIES, LLC                      **LONG ARM SERVICE**
     (f/k/a, Cooper Industries, Inc., f/k/a, The Cooper-Bessemer Corporation)
     Through its registered agent for service of process:
     The Corporation Trust Company
     Corporation Trust Center
     1209 Orange St.
     Wilmington, DE 19801

6.   IMO INDUSTRIES, INC. (f/k/a IMO Delaval, Inc., f/k/a Transamerica Delaval, Inc., f/k/a
     Delaval Turbine, Inc.)
     Through its registered agent:
     CT Corporation System
     3867 Plaza Tower Dr.
     Baton Rouge, LA 70816

7.   WARREN PUMPS, LLC                           **LONG ARM SERVICE**
     Through its registered agent:
     The Corporation Trust Company
     Corporation Trust Center
     1209 Orange St.
     Wilmington, DE 19801

8.   BUFFALO PUMPS, INC.                         **LONG ARM SERVICE**
     Through its registered agent:
     The Corporation Trust Company
     Corporation Trust Center
     1209 Orange St.
     Wilmington, DE 19801

9.   PENTAIR FLOW TECHNOLOGIES, LLC
     (f/k/a Pentair Pump Group, Inc., successor-in-interest to AURORA PUMP CO.)
     Through its registered agent:
     Corporation Service Company
     320 Somerulos St.
     Baton Rouge, LA 70802

10.  GOULDS PUMPS, INCORPORATED
     Through its registered agent:
     CT Corporation System
     3867 Plaza Tower Dr.
     Baton Rouge, LA 70816

11.  CRANE CO.                                   **LONG ARM SERVICE**
     Through its registered agent:
     The Corporation Trust Company
     Corporation Trust Center
     1209 Orange St.
     Wilmington, DE 19801

12.  WEIR VALVE & CONTROLS USA                   **LONG ARM SERVICE**
     (f/k/a Atwwod & Morrill Co., Inc.
     Through its registered agent:
     CT Corporation System
     155 Federal St.
     Suite 700
     Boston, MA 02110

13.  CONTINENTAL MOTORS, INC.                    **LONG ARM SERVICE**
     (as successor in interest to GRAY MOTOR CORPORATION)
     Through its registered agent:
     National Corporate Research Ltd.
     850 New Burton Road
     Suite 201
     Dover, DE 19904

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER:                           DIVISION " "                        SEC: " "

WILLIAM C. BELL

versus

ASBESTOS DEFENDANTS; ET. AL.

FILED:_____        _____
                                            DEPUTY CLERK

### OPPOSITION TO MOTIONS FOR EXTENSION OF TIME

**MAY IT PLEASE THE COURT:**

Plaintiff, William C. Bell, objects to the granting of any and all Motions for Extension of

Time which may be filed in this matter requesting extensions to respond to plaintiff's Petition for

Damages. William C. Bell suffers from mesothelioma, a terminal cancer, and it is in the interest

of justice that this case be set for trial prior to his death. Granting of any Motions for Extensions

of time would unjustly delay the proceedings of this matter.

WHEREFORE, plaintiff opposes any Motions for Extension of time.

Respectfully submitted:

ROUSSEL & CLEMENT

GEROLYN P. ROUSSEL #1134
PERRY J. ROUSSEL, JR. #20351
JONATHAN B. CLEMENT #30444
LAUREN R. CLEMENT - #31106
1550 WEST CAUSEWAY APPROACH
MANDEVILLE, LA 70471
TELEPHONE: (985) 778-2733
ATTORNEYS FOR PLAINTIFF,
WILLIAM C. BELL

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served with the Petition for
Damages upon all parties.

JONATHAN B. CLEMENT

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER:                        DIVISION " "                        SEC: " "

WILLIAM C. BELL

versus

ASBESTOS DEFENDANTS; ET. AL.

FILED:_____          _____
                                          DEPUTY CLERK

NOTICE OF VIDEOTAPED DEPOSITION FOR ALL PURPOSES
INCLUDING PERPETUATION PURPOSES

TO: ALL DEFENDANTS:

   **PLEASE TAKE NOTICE** that undersigned counsel will take the videotaped deposition

of William C. Bell on Tuesday, November 17, 2015, beginning at 9:30 a.m. (Central Time),

**which deposition will continue from day to day until completed and will not be terminated**

**until completed**.  This deposition will be held at the offices of Roussel & Clement, 1550 West

Causeway Approach, Mandeville, LA 70471, before a Notary Public or other qualified officer

who is authorized to administer oaths, at which time and place you are hereby notified to appear

and take part as you deem fit and proper.  This deposition is being taken for all purposes,

including perpetuation, pursuant to the Louisiana Code of Civil Procedure.


**CERTIFICATE OF SERVICE**                Respectfully submitted:

   I certify that a copy of the foregoing      ROUSSEL & CLEMENT
pleading has been served with the Petition
for Damages upon all parties.

_____                 _____
   **JONATHAN B. CLEMENT**                 GEROLYN P. ROUSSEL #1134
                                          PERRY J. ROUSSEL, JR. #20351
                                          JONATHAN B. CLEMENT #30444
                                          LAUREN R. CLEMENT - #31106
                                          1550 WEST CAUSEWAY APPROACH
                                          MANDEVILLE, LA 70471
                                          TELEPHONE: (985) 778-2733
                                          ATTORNEYS FOR PLAINTIFF,
                                          WILLIAM C. BELL